## PROVIDENCE COUNTY.

PHŒBE A. STAPLES *vs.* JOHN M. SCHMID *et al.*

An employé was left with an assistant in charge of a tradesman's shop.

*Held,* that he was both salesman and custodian.

*Held,* further, that the tradesman, his master, was liable for his act in causing the arrest and search of a customer whom he suspected of pilfering, but as the jury found, erroneously suspected.

*Held,* further, that the master not having participated in the act of the employé nor having approved it could be held liable only for actual damages, and was not liable for punitive damages.

*Hagan* v. *Providence & Worcester R. R. Co.,* 3 R. I. 88, affirmed.

DEFENDANTS' petition for a new trial.

*February* 25, 1893. DOUGLAS, J. The jury have substantially found in this case that the defendants' salesman erroneously suspecting the plaintiff of having stolen a package of spoons from the store which was in his charge, detained her, sent for a police officer, and caused her to be sent to the police station and there searched, and they assessed the damages to the plaintiff in the sum of seven hundred and fifty dollars.

The defendants bring their petition for a new trial alleging that the verdict is against the evidence, that if the facts were as found the defendants are not liable and that the damages are excessive.

The questions of law involved are raised by exceptions to the refusal of the presiding judge to rule as requested by the defendants and by exceptions to the charge as given. The proposition upon which these exceptions are based and which the defendants contend is established by the cases they cite is, that, as a matter of law, it is not within the scope of the employment of a salesman left in charge of a store to cause the arrest and search of a person whom he believes to have stolen property from his custody.

The general rule defining the liability of a master for the acts of a servant is thus laid down in Wood on Master and Servant, § 279 : "For all acts done by the servant under the

express orders or direction of the master as well as for all acts done in the execution of his master's business within the scope of his employment, the master is responsible, but when the act is not within the scope of his employment or in obedience to the master's orders, it is the act of the servant and not of the master, and the servant alone is responsible therefor."

The principle of the rule is stated by Andrews, J., in *Rounds* v. *Del., Lack. & Western R. R. Co.*, 64 N. Y. 129, as follows: "The master is liable only for the authorized acts of the servant, and the root of his liability for the servant's act is his consent, express or implied, thereto. When the master is to be considered as having authorized the wrongful act of the servant so as to make him liable for his misconduct is the point of difficulty. Where authority is conferred to act for another without special limitation, it carries with it by implication, authority to do all things necessary to its execution; and when it involves the discretion of the servant or the use of force towards or against another, the use of such discretion or force is a part of the thing authorized, and when exercised becomes as to third persons the discretion and act of the master. . . . The master who puts the servant in a place of trust or responsibility, or commits to him the management of his business or the care of his property, is justly held responsible when the servant, through lack of judgment or discretion, or from infirmity of temper or under the influence of passion aroused by the circumstances and the occasion goes beyond the strict line of his duty or authority and inflicts an unjustifiable injury upon another."

It is not contended that this general rule is not settled by reason and authority, but the defendants say that the acts here complained of were not within the scope of their agent's employment. It is obvious that in most cases the question is one of fact. What are the limitations of an agent's or a servant's authority depends generally upon the things he is to do, the object he is set to accomplish, the degree of discretion which the position where he is placed and the exigen-

cies of the occasion reasonably call for. These are matters of common knowledge when they pertain to the ordinary occupations of men, matters of fact, as well known to the jury as to the court, or inferences of fact from well. known or proven facts which it is as much the province of the jury to draw as it is the province of the court to carry out a principle of law. to particular deductions.

It is only when the act under consideration is clearly foreign to the scope of the employment that the court can exclude it as a matter of law. Opinion of Denman, J., for a majority of the court in *Burns* v. *Poulson*, 42 L. J. C. P. 302 ; L. R. 8 C. P. 563. ''What is or is not within the course of the servant's employment or the course of his authority is, within certain limits, a question of fact; and the decisions of the courts on the subject are not altogether consistent, or easily to be reconciled.'' Addison on Torts, 6th ed. by H. G. Wood,. *107. Some of these inconsistencies have evidently arisen from attempts to ascertain sharp legal distinctions where the cases presented legitimately only questions of fact. Bearing in mind these considerations we may now consider the cases cited by counsel as settling principles by which this case should be decided.

Two principles seem to be recognized by the English cases cited.

*First.* That when a servant not specially appointed to protect property arrests a person whom he supposes to have stolen his master's goods, the servant must be presumed to have acted in pursuance of his duty as a good citizen and not in the scope of his employment as a servant. This was strenuously urged by counsel in *Edwards* v. *London & North Western Railway Co.*, L. R. 5 C. P. 445, and was adopted ·by the court as the rule for that case. We doubt its cogency as a rule of universal application. The arrest of a thief is not an ordinary necessity of commercial business. An attempt to steal is an extraordinary event which puts the guardian of the property to an instantaneous election of means to frustrate it. A clerk or salesman in such a case may *ex necessitate* be invested with duties and powers which are more ger-

mane to the scope of employment of an officer. The opinions of the judges, however, are instructive in this connection as showing assent to the converse of the proposition, which is nearer the case at bar.

Keating, J., p. 448, says: "If there is any evidence to fix the defendants it must be upon an implied authority resulting from Holmes' position as their servant, and that raises probably the question whether a person in the position of Holmes has implied authority to give into custody any one whom he suspects to have stolen his master's goods. I think there is no such implied authority. It is admitted that the point is new, and that there is no case in which such an authority has been assumed to exist. . . . . There seem no grounds for saying that what was done was in the ordinary course of the business of the company, nor that it was for their benefit, except in so far as it is for the benefit of all the queen's subjects that a criminal should be convicted. If Holmes acted from a sense of the duty which rests on every one to give in charge a person whom he thinks is committing a felony his conduct would in no way be connected with the defendant's."

Montague Smith, J., says: "No doubt if in furtherance of the particular business of the company it is necessary to arrest a person the servants of the company have an implied authority to do it. . . . Here, however, the cause of the arrest was not at all connected with the company's business, and it cannot, I think, be presumed that the company gave authority to their servants generally to apprehend any person whom the servants think is committing a felony, even though on the company's property."

Brett, J. "It is not enough that the act should be for the benefit of the master, but it must be in the ordinary course of business in order that an authority to do it may be implied. In the case of a person being arrested for breaking the company's by-laws it may well be said that this is the way in which the company carry on their business, and similarly if an officer be appointed expressly to watch the company's property. I should think if he took an innocent person into

custody on the charge of stealing it might well be said that the company were liable."

In *Allen* v. *London & South Western Railway Co.*, L. R. 6 Q. B. 65, a booking clerk for the railway company caused the arrest of a person who had apparently attempted to rob the till in his charge. The attempt was unsuccessful and had ceased at the time of the arrest. It was held that such an arrest was not in the scope of the clerk's employment, its object being the punishment of the offence, not the protection of the property, but in the course of his opinion, Blackburn, J., says, p. 68, "I am inclined to think that if a man in charge of a till were to find that a person was attempting to rob it and he could not prevent him from stealing the property otherwise than by taking him into custody, the person in charge of the till might have an implied authority to arrest the offender; or if the clerk had reason to believe that the money had been actually stolen and he could get it back by taking the thief into custody, and he took him into custody with a view of recovering the property taken away, it might be that that also might be within the authority of a person in charge of a till. I am not, however, prepared to pronounce a decided opinion on these proposed cases; the present case is altogether different. There is a marked distinction between an act done for the purpose of protecting the property by preventing a felony or of recovering it back and an act done for the purpose of punishing the offender for that which has already been done."

*Second.* That it cannot be inferred as matter of law that a master has authorized his servant to do an act which he could not lawfully do himself in the circumstances supposed by the servant to exist.

In *Poulton* v. *London & South Western Railway Co.*, L. R. 2 Q. B. 534, this proposition is thus expressed by Mr. Justice Shee, p. 541. "An authority cannot be implied to have been given to a servant to do an act which, if his master were on the spot the master would not be justified in doing, on the assumption of a particular state of facts."

The servant in this case caused the arrest of a passenger

because he supposed the freight due for transportation of the passenger's horse had not been paid. If the supposition had been true the arrest would have been unlawful, and there could be no implied authority because the limit of the servant's powers was defined by Act of Parliament.

In the same case, Blackburn, J., says, p. 538: "There can be no question that where a railway company, or any other body, have upon the spot a person acting as their agent, that is evidence to go to the jury that that person has authority to do all those things on their behalf which are right and proper in the exigences of their business—all such things as somebody must make up his mind, on behalf of the company, whether they should be done or not; and the fact that the company are absent and the person is there to manage their affairs is *primâ facie* evidence that he was clothed with authority to do all that was right and proper; and if he happens to make a mistake or commit an excess, while acting within the scope of his authority his employers are responsible for it."

In applying the principle of this case, its limitations must not be forgotten.

1. It is a rule for the court in the absence of evidence bearing upon the issue. It does not prevent a logical inference of fact from proven facts even when that inference is that the master has directed a wrong.

The Court of Appeals of New York in *Lynch* v. *Metropolitan El. R. Co.*, 90 N. Y. 77, found that the jury were justified in believing from the evidence that the gate keeper was expected by the company to detain persons who refused to present tickets or to pay their fares. The scope of the employment being thus ascertained, they say, p. 86, "In anything that he did he did not act for any purpose of his own but to discharge what he believed to be his duty to his principal. It matters not that he exceeded the powers conferred upon him by his principal and that he did an act which the principal was not authorized to do, so long as he acted in the line of his duty, or, being engaged in the service of the defendant, attempted to perform a duty, pertaining or which he believed to pertain to that service. He detained the plain-

tiff at the [railroad] station, caused his arrest, went with the police officer to the police station, there made a complaint and then the next morning appeared before the police magistrate and renewed his complaint. These were successive steps taken by the gate keeper to enforce the payment of the fare by the plaintiff or to punish him for refusing to pay it, and for all that he did the defendant is responsible." See also *Smith* v. *Webster*, 23 Mich. 298; *Barden* v. *Felch*, 109 Mass. 154.

2. Neither does this principle forbid the court to imply the responsibility of the master for the wrongful or excessive exercise of the servant's discretion in a case where the act done would have been lawful if the supposed circumstances had been real.

This limitation, carefully made by Mr. Justice Shee, seems to have been ignored in the case of *Mali* v. *Lord*, 39 N. Y. 381, which is cited by counsel as decisive of the case at bar.

The opinion, delivered by Judge Grover, rests the case upon the reasoning of *Poulton* v. *London & South Western Railway Co.*, but makes, as we think, an unwarranted extension of it. The court say, p. 384, "It cannot be presumed that a master, by intrusting his servant with his property and conferring power upon him to transact his business, thereby authorizes him to do any act for its protection that he could not lawfully do himself if present. The master would not, if present, be justified in arresting, detaining and searching a person upon suspicion, however strong, of having stolen his goods and secreted them upon his person. The authority of the superintendent could not therefore be implied from his employment."

It is quite true that the master would have had no right to arrest and search an innocent person; but it is equally true that he would have had the right to detain a thief and to recapture his property from him. The case therefore was one where the act, aside from any excessive force, might be lawful or unlawful according to whether the supposed circumstances were real or unreal. The servant was left in a situation where he was obliged to determine the fact and where

his duty to his master depended upon his decision. The decision was his, as the substitute of the master, and the act was one intended by him to be for his master's benefit and which his duty required if the facts were as supposed. Hence, as to third persons, it was the master's act. The criterion of the master's liability can never be whether the act would have been lawful for the master to have done in the circumstances as they actually existed.

It remains to apply these principles to the case at bar. The servant in this case was left with an assistant in charge of his master's store. His ordinary duties undoubtedly were to show goods and to sell them to customers. It was however equally his duty to protect his master's property from pilfering. The acts complained of were evidently done with that intention. The arrest was for the purpose of searching for and recovering the master's property not with the object of punishing crime against the public. The establishment was not a railroad station where the multiplicity of employees confines each one to a narrow round of duties, where special officers are stationed to preserve order and detain criminals, nor a large dry goods emporium where detectives and watchmen are employed to guard against thieves. The servant here was salesman and custodian in one. Whatever the master might do in the protection of his property he expected his servant to do in his absence. If the servant had seen the plaintiff take up and secrete the package of spoons in question and had allowed her to walk away with them unmolested, could anyone say that he had not been derelict in his duty to his master? If in the performance of this duty he mistook the occasion for it, or exceeded his powers or employed an improper degree of compulsion, the mistake and the excess must be answered for by the master.

We conclude, therefore, that the directions asked by the defendants were rightly refused and that the charge correctly stated the law of the case. We are not convinced by an examination of the testimony that the preponderance of evidence is so strongly against the verdict as to warrant us in disturbing it. If the jury believed the plaintiff instead of the clerk

and the police officer they were justified in finding the verdict of guilty.

The damages however which were awarded are grossly excessive as compensation for the wrong which the plaintiff suffered. They must have been estimated on the supposition that exemplary or punitive damages were allowable in a case of this kind. The law upon this point was settled at an early day by this court in the case of *Hagan* v. *Providence & Worcester R. R. Co.*, 3 R. I. 88, where the late Chief Justice Brayton clearly shows that unless the principal participates in or approves the wrong of his servant he can be held only for the actual damages occasioned thereby. The opinion of Judge Brayton is quoted with approval by the Supreme Court of the United States in the recent case *Lake Shore & Michigan Southern R. R. Co.* v. *Prentice*, 147 U. S. 101, 114. For this reason we think a new trial should be granted unless the plaintiff will consent to remit the damages in excess of the sum of one hundred dollars.

*George J. West,* for plaintiff.
*Frederick Rueckert,* for defendant.